# IN THE COURT OF APPEALS OF IOWA

No. 20-0028
Filed May 12, 2021

**DUSTIN KINDIG,**
      Plaintiff-Appellant,

**vs.**

**SPENCER NEWMAN, COLBY NEWMAN, JOSH BURNS, JACOB SCHROEDER, and THE PRESS BOX GRILLE & BAR, INC. d/b/a THE PRESS BOX GRILLE & BAR,**
      Defendants-Appellees.
_____

Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, Judge.

Dustin Kindig appeals dismissal of his personal injury claims. **AFFIRMED.**

Matthew M. Boles, Adam C. Witosky, and Christopher Stewart of Gribble Boles Stewart & Witosky Law, Des Moines, for appellant.

Karla J. Shea of Swisher & Cohrt, P.L.C., Waterloo, for appellees Spencer Newman and Josh Burns.

Kelly W. Otto, Madison, Wisconsin, for appellee Jacob Schroeder.

Teresa K. Baumann and Jace T. Bisgard of Shuttleworth & Ingersoll, Cedar Rapids, for appellee The Press Box Grille & Bar, Inc.

William H. Roemerman of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellee Colby Newman.

Heard by Tabor, P.J., and Mullins and May, JJ.

**MAY, Judge.**

A bachelor party devolved into discord and violence.  In the wake, Dustin Kindig brought suit for injuries he sustained during the party.  The district court granted summary judgment to some defendants.  A jury found in favor of the remaining defendants.  Dustin appeals.

**I. Facts and Prior Proceedings**

In 2017, Colby Newman planned a bachelor party for his brother, Spencer Newman.  Colby asked his cousin, who worked as a manager at The Press Box Bar and Grille (Press Box), if he could borrow a small bus owned by Press Box for the party.[1]  Press Box owner, Jeff Larkin, agreed Colby could borrow the bus as long as the group had a designated driver, filled the bus with gasoline before returning it, and cleaned it up before returning it.  Colby did not pay to use the bus, and Colby and Press Box did not enter into a written agreement.

Then, on October 21, the bachelor party set out for the evening.  Jacob Schroeder served as the group's designated driver, and the rest of the partygoers drank alcohol as they travelled from location to location to eat and drink.  All of the partygoers, excluding Jacob, became intoxicated.  Later in the evening, the group disagreed where they should go next.  Most agreed they should head home.  Dustin wanted to go to a strip club.  But Spencer, the bachelor, went to the front of the bus and told Dustin and Jacob that he just wanted to head home.

From this point, the men's retelling of the evening differs.  Spencer and other partygoers recall Dustin pushing him and then hitting him on the eyebrow

---

[1] The bus is a small, wheelchair-accessible bus, which the Press Box owner uses to tailgate and takes to his child's sporting events.

with a glass bottle. The two men then fought on the floor of the bus. Jacob then pulled the bus over. Dustin got off the bus. Another partygoer, Joshua (Josh) Burns, also got off the bus. Josh claims he went to ask why Dustin hit Spencer and then they "locked up" but "[n]othing ever happened." The two "wrestl[ed] around standing up" until Colby separated them. Josh looked away, and then Dustin attacked him. Colby followed Dustin and tried to persuade him to get back on the bus. Those on the bus drove around looking for Dustin and Colby before eventually giving up and returning home.

Dustin recalls matters differently. Dustin recalls Spencer shoving him first and then hitting him in the face with a bottle. Then, after Dustin exited the bus and was bent over, Josh punched him in the face several times. And then, Dustin claims, Jacob drove away—abandoning Dustin—when Jacob heard police sirens.

So Dustin initiated these proceedings. He alleged battery by Spencer; battery by Josh; battery and aiding and abetting battery by Colby; negligence by Jacob; and common carrier liability, negligence per se, negligence, and premises liability by Press Box.

The district court granted summary judgment to Jacob and Press Box. Dustin moved to voluntarily dismiss his claims against Colby, which the court granted. The remaining claims of battery by Spencer and Josh were tried before a jury. The jury returned a defense verdict.

Dustin now appeals. He claims (1) the court erred in permitting Spencer and Josh to argue self-defense, (2) the court improperly admitted prior bad acts testimony, (3) the court should have granted a mistrial because defense counsel referred to firearms during jury selection, (4) Press Box was not entitled to

summary judgment, and (5) Jacob was not entitled to summary judgment. We address each claim in turn and will discuss additional facts as necessary.

## II. Discussion

### A. Self-defense

For his first claim, Dustin argues the district court erred in permitting Spencer and Josh to rely on self-defense at trial. Dustin claims Spencer and Josh failed to affirmatively plead self-defense in accordance with Iowa Rule of Civil Procedure 1.421(1), which requires "[e]very defense to a claim for relief in any pleading must be asserted in the pleading responsive thereto, or in an amendment to the answer made within 20 days after service of the answer." Spencer and Josh respond by arguing their answer[2] put Dustin on notice of the self-defense issue by stating that Dustin initiated the physical confrontations and that their conduct toward him was merely responsive to his violence. They also note that, even if their formal pleading was insufficient, they did offer to amend their pleading to conform to the proof. And so, because self-defense "had been litigated throughout" the case, the court had discretion to permit an amendment.

To be clear, the district court did not formally grant a motion to amend. Rather, when Spencer and Josh offered to amend, the court simply concluded the issue was already part of the case.

Still, the parties agree that—from a *functional* perspective—the district court permitted Spencer and Josh to add a previously unpled (or at least allegedly unpled) affirmative defense. In describing our standard of review, Dustin notes

---

[2] Spencer and Josh filed one joint answer.

"[a]llowing presentation of an unpled affirmative defense is reviewed for abuse of discretion." Along similar lines, Spencer and Josh note, "The scope of review for submitting an allegedly unpled affirmative defense is for abuse of discretion." And both sides rely on the same case, *Rife v. D.T. Corner, Inc.*, in which the issue was whether the district court abused its discretion in permitting amendments to the pleadings. 641 N.W.2d 761, 766 (Iowa 2002).

So, for our review, we assume (without deciding) that Spencer and Josh's answer did not adequately plead self-defense. We further assume that, by submitting the self-defense issue, the district court effectively[3] allowed Spencer and Josh to amend to conform to the proof. And so we focus our review on whether the district court abused its discretion by permitting that amendment.

Familiar principles govern our review:

> We afford district courts considerable discretion in ruling on motions for leave to amend pleadings. Consequently, we will reverse only if the record indicates the court clearly abused its discretion. We will find an abuse of discretion when the court bases its decision on clearly untenable grounds or to an extent clearly unreasonable.
> . . . .
> Iowa Rule of Civil Procedure [1.402] governs the amendment of pleadings. This rule instructs district courts to freely grant leave to amend when required by the interests of justice. Generally, a party may amend a pleading at any time before a decision is rendered, even after the close of the presentation of the evidence. As long as the amendment does not substantially change the issues or defense of the case, the court should permit the amendment. Even an amendment that substantially changes the issues may still be allowed if the opposing party is not prejudiced or unfairly surprised.

*Id.* at 766–67 (citations omitted).

---

[3] Again, the court did not describe its ruling as granting an amendment. But we seek to avoid elevating "form over substance." *See, e.g.*, *Toney v. Parker*, ___ N.W.2d ___, ___, 2021 WL 1431683, at *6 (Iowa 2021). So we focus on the *substantive effect* of the court's ruling.

Applying these principles here, we see no abuse of discretion. Even assuming Spencer and Josh's answer did not adequately plead an affirmative defense, it did far more than merely deny Dustin's allegations. It stated Dustin "got very angry and assaulted Spencer," "Dustin was verbally as well as physically abusive to Spencer," "after Dustin assaulted Spencer . . . the men engaged in a physical altercation," and "Dustin . . . repeatedly assaulted Joshua . . . outside of the bus." These statements announced Spencer and Josh's position that their conduct was responsive to Dustin's assaults against them.

Moreover, as the case proceeded, the parties were aware Spencer and Josh were asserting self-defense. Dustin's counsel conceded, "I think throughout the discovery process they've alleged [self-defense] . . . ." Plus the proposed jury instructions—which were filed August 15, 2019, several months prior to trial— included an instruction on self-defense as an affirmative defense. The same day, Spencer and Josh filed a trial brief that discussed self-defense as an affirmative defense. Yet, as Spencer and Josh point out, Dustin did not respond by requesting "additional discovery as he would if he had been surprised and needed additional information."

All things considered, we do not believe permitting Spencer and Josh to assert self-defense created a "substantial[] change" in the issues before the court. *Id.* at 767. Nor was Dustin "prejudiced or unfairly surprised." *Id.* So we conclude the district court did not abuse its discretion.

**B. Prior bad acts**

Next, Dustin argues the district court abused its discretion in admitting evidence of his prior bad acts. He points to testimony from Jacob, Spencer, Josh,

and Colby discussing specific instances of violence involving Dustin, as well as their general knowledge of Dustin's history of violence. [4]

"We review evidentiary rulings by the district court for abuse of discretion. . . . We reverse the district court's admission as an abuse of discretion when the grounds for admission were 'clearly untenable or clearly unreasonable.'" *State v. Donahue*, 957 N.W.2d 1, 6 (Iowa 2021) (citations omitted).

The district court relied on Iowa Rules of Evidence 5.404 and 5.405 to admit evidence of Dustin's violence. Rule 5.404(a)(2)(b)(i) provides that in civil cases, "Evidence of an alleged victim's character for violence may be offered on the issue of self-defense by a party accused of assaultive conduct against the victim." So because Spencer and Josh claimed they acted in self-defense, evidence of Dustin's character for violence was admissible. *See* Iowa R. Evid. 5.404(a)(2)(b)(i). However, for Spencer and Josh to be able to introduce specific instances of violence to establish Dustin's character for violence, rule 5.405(b) requires the character trait be an essential element of their self-defense claim. *See* Iowa R. Evid. 5.405(b) ("When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be

---

[4] Dustin never objected to the testimony as inadmissible prior bad acts. Dustin only objected to Colby's testimony as non-responsive to the question presented and containing hearsay. So we note some uncertainty about error preservation. *See State v. Bergmann*, 633 N.W.2d 328, 332 (Iowa 2001) ("Although the State concedes that error has been preserved on every issue raised on appeal . . . , we disagree."). It appears the parties believe the court's ruling on Dustin's motion in limine was sufficiently definitive to preserve error. *See Wailes v. Hy-Vee, Inc.*, 861 N.W.2d 262, 264 (Iowa Ct. App. 2014) (noting a motion in limine alone is generally insufficient to preserve evidentiary errors but "[w]hen the court's ruling on a motion in limine is unequivocal and leaves no question that the challenged evidence will or will not be admitted at trial, counsel need not take steps at trial to preserve error"). We assume without deciding this is correct.

proved by relevant specific instances of the person's conduct."). The supreme court recently clarified the application of rule 5.405 by holding "that a defendant asserting self-defense or justification may not prove the victim's aggressive or violent character by specific conduct of the victim *unless* the conduct was previously known to the defendant." *State v. Williams*, 929 N.W.2d 621, 636 (Iowa 2019).

So we look to the testimony flagged by Dustin to determine if it contains evidence of specific conduct or acts that were not known to Spencer and Josh. First, Dustin highlights testimony from Jacob. He testified that he knew Dustin had been in fights and knew of his reputation for fighting and violence. But Jacob did not testify about specific instances of violence. So rule 5.405 does not come into play with respect to Jacob's testimony. It only touched on Dustin's character for violence as permitted by rule 5.404(a)(2)(b)(i).

Next up, Spencer testified about seeing Dustin get into physical fights; pulling Dustin out of fights; observing Dustin get kicked out of bars for fighting; and observing Dustin hit others with objects like an unopen beer can, a pool cue, a pool ball, and a baseball bat. This testimony does get into specific instances of violence. But it is permissible because they were previously known by Spencer, a defendant asserting self-defense, who testified about what he personally saw Dustin do. *See id.*

For his part, Josh testified he knew of Dustin's reputation for violence; he had previously seen Dustin get into fights, both verbal and physical; and, during some of these instances, Dustin was intoxicated. Again, this testimony gets into

specific instances of violence. But it is permissible because the instances were previously known by Josh, a defendant asserting self-defense. *See id.*

Finally, Colby testified that he never witnessed Dustin fight firsthand but knew of his reputation for fighting. So he never testified to specific instances of violence, and rule 5.405 does not come into play. While Colby's testimony touched on Dustin's character for violence, it was permitted by rule 5.404(a)(2)(b)(i).

All things considered, we do not believe the district court abused its discretion in admitting testimony about Dustin's prior violence. We move on to his next claim.

**C. Mistrial motions**

Dustin claims the district court should have granted his motion for mistrial because defense counsel discussed firearms during voir dire. Before reaching the merits of this claim, however, we must first consider whether Dustin preserved error. *See, e.g.*, *Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) ("In view of the range of interests protected by our error preservation rules, this court will consider on appeal whether error was preserved despite the opposing party's omission in not raising this issue at trial or on appeal.").

During voir dire, defense counsel told potential jurors that, although

the incident that we're going to be talking about [in the trial] does not involve guns, there may be some testimony touching on the use of guns. And because, as you all know, I'm sure, that's a very hot button issue in our society, I need to know if any of you have strong feelings—

At this stage, Dustin's counsel interrupted and asked to approach the bench. The transcript shows "there was an off-the-record discussion at the bench between the court and counsel." The record does not show the contents of the

discussion. In any event, defense counsel then asked the pool, "Does anyone here feel strongly about the use of guns?", and the following exchange occurred:

DEFENSE COUNSEL: [Potential juror M]? How—what's your feeling about the use of guns? POTENTIAL JUROR [M]: I don't like them.

DEFENSE COUNSEL: You don't like them? POTENTIAL JUROR [M]: No.

DEFENSE COUNSEL: You don't feel like they have a place? POTENTIAL JUROR [M]: They have a place.

DEFENSE COUNSEL: Okay. What's their place? POTENTIAL JUROR [M]: In war maybe.

DEFENSE COUNSEL: Anyone else feel strongly about the use of guns? POTENTIAL JUROR [R]: Yeah. I think everybody should carry one.

DEFENSE COUNSEL: Okay. Do you think everybody should use them on other people? POTENTIAL JUROR [R]: No. I didn't say on other people. I said to defend yourself.

DEFENSE COUNSEL: Okay. Would you be concerned in a situation where somebody brandished a gun or used a gun against somebody else? POTENTIAL JUROR [R]: I don't know—I don't follow. What do you mean exactly?

DEFENSE COUNSEL: Well, I—other than—I mean, obviously you have military experience and guns were used and there's no doubt about that. But outside of that, do you have strong feelings about the use of a handgun by a private citizen not in self-defense? POTENTIAL JUROR [R]: Yeah. I don't think there's a place for that. Everyone should have one to defend themselves.

DEFENSE COUNSEL: Anyone else have strong feelings about guns? POTENTIAL JUROR [U]: Mixed with alcohol, yes.

DEFENSE COUNSEL: That that's a bad combination? POTENTIAL JUROR [U]: Yeah. Well, any kind of drug. I'm not just picking on alcohol. Any kind of drug that affects your brain is going to make choices—

DEFENSE COUNSEL: Sure. POTENTIAL JUROR [U]: — different and—

(The court reporter interrupted.)

POTENTIAL JUROR [U]:—and with a weapon you can kill someone instantly with should not be mixed regardless of the situation.

DEFENSE COUNSEL: Okay. Anyone else? [Potential juror E]? POTENTIAL JUROR [E]: Well, I believe there's a place for them for hunting and recreational shooting and areas like that, that we should be able to have them and use them for that kind of stuff.

DEFENSE COUNSEL: Okay. But I assume not between two people to settle a fight? POTENTIAL JUROR [E]: No. Absolutely.

DEFENSE COUNSEL: Has anyone themself [sic] or had a family member or close friend who was shot? [Potential juror EP]? What happened? POTENTIAL JUROR [EP]: Just—I mean, I lost three friends to murder.

DEFENSE COUNSEL: To street crime? POTENTIAL JUROR [EP]: Yeah.

DEFENSE COUNSEL: Does that give you strong feelings about the use of weapons? POTENTIAL JUROR [EP]: I mean, I don't own a gun or anything like that so—I mean, I feel like—I mean, it's a touchy subject. But, I mean, I'm just not one to carry so—I mean, to each his own, I guess.

DEFENSE COUNSEL: Okay. Did someone else raise their hand? [Potential juror M]? POTENTIAL JUROR [M]: My younger brother was murdered four years ago.

DEFENSE COUNSEL: Oh, my God. I'm sorry. I didn't mean to bring up something that was that personal.

Defense counsel then moved on to other topics of questioning. After defense counsel passed for cause, the parties exercised their strikes. Then the court read the names of the jurors selected; the parties confirmed the named jurors were indeed the jury they had selected; the other prospective jurors were excused; the jury was sworn in; and the court gave preliminary instructions. The jury was then excused for a recess. At this point, the following record was made:

THE COURT: We remain on the record outside the presence of the jury. Any issues either side wants to bring up regarding jury selection? I didn't see any. But, [plaintiff's counsel], anything for the record on jury selection, the process?

PLAINTIFF COUNSEL: I don't believe so, Your Honor.

THE COURT: All right. [Defense counsel]?

DEFENSE COUNSEL: Nothing regarding jury selection.

Soon after, the court excused the jury for the day.

The next morning, the court and counsel made additional record outside the presence of the jury. After hearing argument, the court ruled that evidence of firearms would not be admitted. At this point, Dustin's counsel moved for a mistrial based upon defense counsel's discussions about guns during jury selection.

We question whether this motion was timely. A party must move for mistrial when the grounds first become apparent. *See State v. Cornelius*, 293 N.W.2d 267, 269 (Iowa 1980) ("A mistrial motion must be made when the grounds therefor first became apparent. Here defendant should have asked for a mistrial when the allegedly prejudicial question was asked." (citation omitted)); *State v. Groat*, No. 19-1809, 2021 WL 1016593, at *2 n.1 (Iowa Ct. App. Mar. 17, 2021); *State v. Hoosman*, No. 04-1364, 2006 WL 2265413, at *4 (Iowa Ct. App. Aug. 9, 2006). If a party fails to do so, error is not preserved. *Cornelius*, 293 N.W.2d at 269.

The alleged grounds for mistrial were defense counsel's questions to potential jurors about guns. Those questions were, of course, apparent to plaintiff's counsel during jury selection. Indeed, plaintiff's counsel later admitted he had thought about moving for mistrial while defense counsel was asking about guns but then decided against it. Nor did plaintiff raise the issue when—immediately after the jury was sworn—the court specifically asked if either party wished to make any record concerning jury selection. Given this record, we doubt error was preserved through Dustin's motion on the day after jury selection.

In an abundance of caution, however, we consider plaintiff's mistrial argument on the merits. "A mistrial is appropriate when 'an impartial verdict cannot be reached' or the verdict 'would have to be reversed on appeal due to an obvious procedural error in the trial.'" *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (citation omitted). We review the district court's ruling on motions for mistrial for an abuse of discretion. *See State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). "[W]e only reverse if the district court's decision rested on grounds or reasoning that were clearly untenable or clearly unreasonable." *Id.*

Applying these standards, we see no grounds for reversal. We agree that defense counsel's questions about guns could have piqued the jurors' curiosity as to how firearms might fit into the story of this case. But, as Joshua and Spencer point out, defense counsel "never mentioned who might have a gun." For all the jury knew, counsel "could have been referring to proposed testimony that one of her clients or a witness wielded a gun," not Dustin.

In any event, as the district court noted, "we have a lot of things in jury selection that don't necessarily come up in trial—jurors follow the instructions." And indeed, the court instructed the jurors to "base [their] verdict only upon the evidence and the court's instructions." The court also instructed the jurors that "statements" and "questions" by the lawyers "are not evidence." Like the district court, we presume the jury followed these instructions. *See State v. Fontenot*, ___ N.W.2d ___, ___, 2021 WL 1583815, at *10 (Iowa 2021). So we do not believe defense counsel's questions concerning firearms created grounds for a mistrial. The district court did not abuse its discretion by denying Dustin's motion.

Dustin also made a second motion after Spencer testified as follows:

> Q. Have you had any personal experience with Dustin being violent or fighting? A. Multiple experiences.
> Q. Okay. Tell the jury about that. A. Some that I can't talk about, but—
> PLAINTIFF COUNSEL: Can we approach, Your Honor? Can we approach?

At this point, the court excused the jury and made record outside their presence. Plaintiff's counsel moved for mistrial based upon Spencer's alleged "violation of the motion in limine" ruling, in which the court excluded some evidence of violence by Spencer. Defense counsel responded that while Spencer "should

not have said that there were things he shouldn't talk about," his comment does not "rise[] to the level of a mistrial." The court admonished Spencer and defense counsel about the impropriety of Spencer's comment. But the court concluded a mistrial was not warranted. Then, when questioning resumed, the court instructed the jury to disregard Spencer's "nonresponsive answer."

We disapprove of Spencer's behavior. But we think the court handled the situation appropriately. While Spencer's comment could have tipped the jury off that there may be more to the story, it did not inject any new specifics into the story, and it was not so prejudicial as to necessitate a mistrial. Moreover, the court expressly instructed the jury to disregard Spencer's comment. This message was reinforced by the court's final instructions, which directed the jurors that "[a]ny testimony I [told] you to disregard" is "not evidence" upon which they could "base [their] verdict." Again, we presume the jury followed instructions. *Id.* So we presume they disregarded Spencer's comment. And we find no abuse of discretion in the district court's refusal to grant a mistrial.

### D. Summary judgment

Dustin's remaining claims challenge the district court's grant of summary judgment to Press Box and Jacob. We review the district court's summary judgment ruling for the correction of legal error. *In re Estate of Franken*, 944 N.W.2d 853, 857 (Iowa 2020). Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "We review the evidence in the light most favorable to the nonmoving party." *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007). But "[a] party resisting a

motion for summary judgment cannot rely on the mere assertions in [their] pleadings but must come forward with evidence to demonstrate that a genuine issue of fact is presented." *Id.*

*1. Press Box*

We first address Dustin's arguments relating to Press Box, which owned the bus. In granting summary judgment in Press Box's favor, the court dismissed Dustin's claims of common carrier liability, negligence per se, negligence, and premises liability. Dustin argues all four claims were viable and should have proceeded to trial. We address each claim in turn.

*a. common carrier*

For Dustin's common carrier liability claim to survive summary judgment, he had to establish Press Box operates as a common carrier.

> Iowa law has defined a common carrier as "one who undertakes to transport, indiscriminately, persons and property for hire." *Employers Mut. Cas. Co. v. Chicago & North Western Transp. Co.*, 521 N.W.2d 692, 693 (Iowa 1994). We have ruled that the distinctive characteristic of a common carrier is that it holds itself out as ready to engage in the transportation of goods or persons for hire, as public employment, and not as a casual occupation. *Kvalheim v. Horace Mann Life Ins. Co.*, 219 N.W.2d 533, 535 (Iowa 1974). A common carrier holds itself out to the public as a carrier of all goods and persons for hire. We, however, have also recognized that a common carrier need not serve all the public all the time. *Id.* A common carrier may combine its transportation function with other vocations and still be considered a common carrier. *Id.* at 538.

*Wright v. Midwest Old Settlers & Threshers Ass'n*, 556 N.W.2d 808, 810–11 (Iowa 1996).

> It is a question of law for the court to determine what constitutes a common carrier, but it is a question of fact whether, under the evidence in a particular case, one charged as a common carrier comes within the definition of that term and is carrying on its business in that capacity.

*Id.* at 810 (citation omitted).

Dustin argues the record contains multiple facts from which a jury could conclude Press Box meets the definitions of a common carrier and carries on business in that capacity. He notes Press Box owns the bus, the bus is often parked on Press Box property, Press Box is a known place to rent a party bus, and he once saw the bus used by a bachelorette party.

Press Box responds that the facts on which Dustin relies all come from his own deposition with no other supporting evidence. Press Box claims this is insufficient to resist summary judgment. Specifically, Press Box asks that we extend the "contradictory affidavit rule"—which prevents a resisting party from relying on an affidavit that clearly and unambiguously contradicts prior deposition testimony to avoid summary judgment—to disregard Dustin's deposition because it contained some internal inconsistency. *See In re Estate of Gray v. Baldi*, 880 N.W.2d 451, 463–64 (Iowa 2016).

We decline to extend the contradictory affidavit rule in this manner. Even so, we agree Dustin failed to establish a fact question as to whether Press Box operated as a common carrier.

The main problem is the nature of Dustin's evidence. While evidence need not be in an admissible form at the summary judgment stage, its *content* must be admissible. *See In re Estate of Klein*, No. 17-1876, 2018 WL 4360997, at *3 (Iowa Ct. App. Sept. 12, 2018) (Danilson, C.J., concurring specially). Here, Dustin sought to avoid summary judgment by relying on his own deposition testimony *about what other people told him* about the bus. These statements were

inadmissible hearsay. *See* Iowa Rs. Evid. 5.801(c) (defining hearsay as "a statement that: (1) [t]he declarant does not make while testifying at the current trial or hearing; and (2) [a] party offers into evidence to prove the truth of the matter asserted in the statement"), .802 (stating "[h]earsay is not admissible unless" certain exceptions apply). Dustin could not have testified about those statements at trial. So they could not provide a basis to avoid summary judgment.

It is true Dustin's deposition also contained non-hearsay observations that (1) he saw the bus parked on Press Box property and (2) he once saw the bus used by a bachelorette party. But even when accepted as true, and even when viewed in the light most favorable to Dustin, these two observations are insufficient to create a jury question as to whether Press Box functioned as a common carrier. They do not permit the reasonable inference that Press Box "holds itself out to the public as a carrier of all goods and persons for hire." *Wright*, 556 N.W.2d at 810 (citation omitted). The district court was right to grant summary judgment as to Dustin's common carrier liability claim.

*b. charter carrier*

Next, Dustin claims Press Box operated as a charter carrier.[5] Iowa Code section 325A.12(3) states, "'Charter carrier' means a person engaged in the business of transporting the public by motor vehicle under charter."[6] And

---

[5] Dustin argues Iowa Code section 325A.2(1)(a) (2018) creates a special duty for charter carriers toward certain classes of persons. So if a charter carrier violated safety regulations and those violations served as the proximate cause of the injuries sustained by a protected person, then Dustin argues the charter carrier would be negligent per se.

[6] Section 235A.12(3) also provides specific exceptions to the charter carrier definition, which are not relevant to this case.

"'[c]harter' means an agreement whereby the owner of a motor vehicle lets the motor vehicle to a group of persons as one party for a specified sum and for a specified act of transportation at a specified time and over an irregular route." Iowa Code § 325A.12(2).

To show Press Box was a "charter carrier," Dustin again points to his deposition testimony that he heard of people renting out the bus, saw it parked on Press Box property, and once saw it used for a bachelorette party. Again, we conclude Dustin's deposition testimony fails to create a genuine issue of material fact. Dustin's statement that *he heard* Press Box rented out the bus for $150 per night is hearsay. *See* Iowa Rs. Evid. 5.801(c); .802. It is not admissible evidence that the bus was *actually* rented out for "a specified sum." And no other admissible evidence shows that Press Box rented the bus for "a specified sum." So, all told, no admissible evidence suggests Press Box was a "charter carrier" that was "engaged in the business of transporting the public" for "a specified sum." *See* Iowa Code § 325A.12(2), (3). Thus, the district court had no choice but to conclude Press Box did not operate as a charter carrier. And the court was correct in dismissing Dustin's negligence per se claim.

*c. negligence*

Dustin also argues the district court erred in dismissing his negligence claim against Press Box. To establish "a prima facie case of negligence, the plaintiff must establish that the defendant owed [them] a duty of care, defendant breached that duty, defendant's breach was the actual and proximate cause of plaintiff's injuries, and plaintiff suffered damages." *Walls v. Jacob N. Printing Co.*, 618 N.W.2d 282, 285 (Iowa 2000). "While summary adjudication is rarely appropriate

in negligence cases, the determination of whether a duty is owed under particular circumstances is a matter of law for the court's determination." *Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 775 (Iowa 2013).

Dustin claims the district court erred in relying on Restatement (Third) of Torts when determining Press Box did not owe him a duty of care. Relying on Restatement (Second) of Torts, Dustin argues we should consider foreseeability of harm to him when determining the duty issue. We disagree. As Press Box points out, the duty

> prong underwent a wholesale revision in *Thompson* [*v. Kaczinski*], 744 N.W.2d [829,] 834–35 [(Iowa 2009)]. Prior to *Thompson*, the supreme court endorsed the consideration of foreseeability in a duty analysis. In *Thompson*, the court adopted the view of the drafters of the Restatement (Third) of Torts, who disapproved of the application of a foreseeability factor in the duty analysis.

*Morris v. Legends Fieldhouse Bar and Grill, LLC*, No. 19-1349, 2020 WL 4498901, at *1 (Iowa Ct. App. Aug. 5, 2020) (citations omitted), *vacated on other grounds* ___ N.W.2d ___, 2021 WL 1703177 (Iowa 2021) (reaffirming "that foreseeability should not enter into the duty calculus but should be considered only in determining whether the defendant was negligent" (citation omitted)). So we do not consider foreseeability of harm when determining whether Press Box owed a duty of care.

Instead, we follow the Restatement (Third), as adopted in *Thompson*, which provides, "An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." 774 N.W.2d at 834 (citation omitted). However, "[a]n actor whose conduct has not created a risk of physical . . . harm to another has no duty of care to the other unless a court determines that

one of the affirmative duties . . . is applicable." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 (Am. L. Inst. 2012) [hereinafter Restatement (Third) of Torts]. Similarly, "there is no duty of care when another is at risk for reasons other than those created by an actor's conduct." *Hoyt*, 829 N.W.2d at 776 n.4. Dustin argues Press Box's failure to impose restrictions on the partygoers, such as limiting alcohol consumption, amounts to conduct that created a risk of physical harm to him sufficient to establish a duty of care. We disagree. We conclude Press Box's relevant conduct of lending its bus to Colby did not create a risk of physical harm to Dustin. Instead the risk of harm was created by the partygoers themselves drinking to the point of intoxication and fighting with one another. So Press Box owed Dustin no general duty of care.

*d. premises liability*

Dustin also argues Press Box owed him a special duty of care based on premises liability. A special duty of care can be created in certain circumstances or relationships. *See* Restatement (Third) of Torts §§ 38–44 (providing when a special duty to another is imposed). One of those special relationships, which creates "a duty of reasonable care with regard to risks that arise within the scope of the relationship," is between "a business or other possessor of land that holds its premises open to the public with those who are lawfully on the premises." *Id.* § 40(a), (b)(3). And Dustin notes our supreme court determined "[t]avern owners fit squarely within the class of business owners contemplated by [Restatement (Third) of Torts] section 40(b)(3)." *Hoyt*, 829 N.W.2d at 777.

So Dustin posits such a special relationship exists here and creates a duty of reasonable care. Again, we disagree. This exception requires the business to

"hold[] its premises open to the public." *See* Restatement (Third) of Torts § 40(b)(3). And no evidence shows Press Box did so *with the bus.* Instead, the evidence established that Press Box provided the bus to Colby as a favor and, at most, may have provided it to a bachelorette party once eighteen months prior. This is not enough to show the Press Box held the bus "open to the public." So the special relationship exception does not apply. Summary judgment was appropriate.

*2. Jacob*

Finally, we address Dustin's arguments concerning Jacob, the driver of the bus. He contends Jacob was not entitled to summary judgment on Dustin's claim of negligence.

It is important to remember, though, that Jacob did not wreck the bus. That is not how Dustin was injured. Rather, as the district court correctly understood, Dustin's claim raises "[t]he legal issue" of whether "a designated driver assumes a duty to protect passengers" like Dustin against "tortious acts of third parties," such as Dustin's fellow party-goers.

In evaluating this issue, we again follow Restatement (Third) of Torts, as adopted in *Thompson*, which provides, "An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." 774 N.W.2d at 834 (citation omitted). However, "[a]n actor whose conduct has not created a risk of physical . . . harm to another has no duty of care to the other unless a court determines that one of the affirmative duties . . . is applicable." Restatement (Third) of Torts § 37. And "there is no duty of care when another is at risk for reasons other than those created by an actor's conduct." *Hoyt*, 829

N.W.2d at 776 n.4. Applying these principles, we conclude Jacob owed no duty of reasonable care to Dustin because Jacob's conduct (driving the bus as a designated driver) did not create the risk of harm at issue here, that is, the risk of injuries through fighting.

But Dustin argues Jacob "took control and charge of Dustin" and assumed a duty of reasonable care to Dustin. Restatement (Third) of Torts § 44(a) imposes a duty of reasonable care when "[a]n actor who, despite no duty to do so, takes charge of another who reasonably appears to be: (1) imperiled; and (2) helpless or unable to protect himself or herself." But there is nothing in the record to suggest Jacob took charge of Dustin. Rather, Jacob just drove the bus as a favor to Colby and Spencer. And contrary to Dustin's assertion, sober individuals interacting with intoxicated individuals do not become their keepers. We note our agreement with these observations by the district court:

> Public policy considerations also weigh against finding a duty of designated drivers to protect intoxicated passengers from the tortious or criminal acts of third-parties. Designated drivers agree to forgo alcohol consumption and chauffeur others from place to place at no expense. This is a generous, gratuitous act which reduces risk to those consuming alcohol and the public at large. Requiring more of designated drivers by expanding their duties from sober driving to ensuring the physical safety of passengers against the acts of third parties would provide an unwarranted disincentive to socially beneficial behavior and has no basis in law. Although the Iowa Supreme Court has not addressed this issue, the implications of imposing additional duties on designated drivers are clearly not in the public interest and other state courts have found the same. *Gushlaw v. Milner*, 42 A.3d 1245, 1263 (R.I. 2012) ("[t]o impose a new duty upon such drivers . . . would certainly chill the courteous offers of transportation now made by 'designated drivers.'"); *Downs ex. rel. Downs v. Bush*, 263 S.W.3d 812, 824 (Ten. 2008) (declining to expand the duties of a designated driver due inconsistency with public policy favoring designated drivers); *Collins v. Thomas*, 938 A.2d 1208, 1211 (Va. 2007) (same); *Cadella v. Robinson*, 903 So.2d 613, 618 (La. Ct. App. 2005) (reasoning that imposing duties to

prevent passengers from performing tortious or criminal acts would have a "chilling effect" on the socially desirable behavior); *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1373 (Ind. 1992) (refusing to expand the duties of designated drivers to protect passengers from themselves).

(Alterations in original and footnote omitted.)

The district court was right to grant summary judgment in Jacob's favor.

## III. Conclusion

There are no grounds for reversal.  We affirm.

**AFFIRMED.**